IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN GILL | ) | CASE NO. 1:03 CV 2326 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| UNIVERSITY HOSPITALS | ) | **REPORT AND RECOMMENDATION** |
| OF CLEVELAND, | ) | |
| | ) | |
| Defendant. | ) | |

On November 14, 2003, Plaintiff John Gill brought suit against Defendant University Hospitals of Cleveland, alleging he was wrongfully terminated and denied accommodation due to his alleged disability in violation of the Americans With Disabilities Act ("ADA"). On May 5, 2005, Defendant filed a *Motion for Summary Judgment* seeking judgment as a matter of law as to all of Plaintiff's claims, contending summary judgment is warranted because: (1) Plaintiff was not disabled as defined under the ADA; (2) Defendant had no notice of his alleged disability at the time it decided to terminate his employment; (3) his request not to perform the task put to him by his supervisor was not a request for an accommodation; (4) Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff – insubordination; and (5) Plaintiff cannot prove the reason offered by Defendant as to his discharge was pretext. Plaintiff failed to submit a response to Defendant's motion, thus, the Court will consider the merits of said motion without the benefit of Plaintiff's response.

For reasons fully set forth below, the Magistrate Judge recommends Defendant's *Motion for Summary Judgment* be GRANTED.

# I. BACKGROUND

Plaintiff began working for Defendant in 1988 as a part-time Division Secretary (Plaintiff's Deposition, p. 63, ¶¶17-24). At the time of his termination, he was a full-time Division Secretary in the Medical/Surgical Nursing Division located at Lerner Tower 9, the ninth floor of Lerner Tower (*Id*. at p. 65, ¶¶11-23). According to Plaintiff, his job duties included answering and making telephone calls regarding patient appointments, entering data regarding patient supplies and patient transfers into the computer, and organizing patient charts (*Id*. at p. 69, ¶¶4-20; p. 70, ¶¶15-18). Plaintiff also testified "floating," *i.e.*, temporarily filling a vacant position (due to employee absences or under-staffing) in another division or unit, was part of his job as Division Secretary (*Id*. at p. 77, ¶¶4-13). Plaintiff indicated he had been asked to "float" many times during his employment with Defendant as it was a routine function of the job (*Id*. at p. 86, ¶¶24-25; p. 87, ¶¶1-8). Plaintiff's immediate supervisor, Kathleen Vidal, testified Plaintiff had never refused to "float" prior to the events leading to his termination (Vidal Deposition, p. 17, ¶¶16-18).

The events at issue in the present case began on January 19, 2003, when Plaintiff was scheduled to work from 3:00 p.m. to 11:30 p.m. (Plaintiff's Deposition, p. 96, ¶¶13-18). During his shift, he was told by a Charge Nurse, Tracy Lee, that he was to "float" to Lerner Tower 8 if needed (*Id*. at p. 100, ¶¶13-18; p. 101, ¶¶20-25). Plaintiff, however, explained to her that his heart rate was elevated and, as such, he could not "float" to Lerner Tower 8, one floor down from his then current position, as requested (*Id*. at p. 101, ¶¶20-25). Another Charge Nurse, Sherry Bancheck, then paged Vidal, the Head Nurse for Lerner Tower 9 and Plaintiff's immediate supervisor (*Id*. at p. 71, ¶¶10-12; p. 105, ¶¶1-5; Vidal's Deposition, Exhibit 8). Vidal called Plaintiff and questioned his refusal to float and explained he was only required to

-2-

"float" to the eighth floor if there was a patient admission (Plaintiff's Deposition, p. 142, ¶¶16-25). Plaintiff

told Vidal his heart rate was elevated to one hundred and one beats per minute and again refused to "float,"

instead requesting he be allowed to stay at Lerner Tower 9 and complete his work there (*Id*. at p. 105,

¶¶8-20; p. 142, ¶¶16-25). Although Plaintiff was not fully aware of the cause of his elevated heart rate

and, thus, could not inform his supervisor of such, Plaintiff now alleges it was brought on by his polycystic

kidney and liver disease, hyperthyroidism, and sinus tachycardia (*Id*. at p. 104, ¶¶16-25; p. 160, ¶¶4-8;

p. 162, ¶¶11-23; p. 189, ¶¶23-24).

When Vidal called Plaintiff a second time, approximately twenty minutes after the first telephone

call ended, Plaintiff again told her he could not "float" to the eighth floor, and asked to stay at Lerner Tower

9 instead (*Id*. at p. 105, ¶¶21-25; p. 106, ¶¶12-15; p. 114, ¶¶1-5). Vidal denied this request (*Id*. at p.

106, ¶¶2-4). Plaintiff then told Vidal he thought he should go to the emergency room because of his

elevated heart rate (*Id*. at p. 114, ¶¶21-23, p. 192, ¶¶1-4). She responded by telling him to "clock out"

(*Id*. at p. 114, ¶¶21-23).

Defendant contends Vidal made the decision to terminate Plaintiff on January 20, 2003, after

confirming that "refusing to perform assigned work" was grounds for immediate termination (Vidal

Deposition, p. 8, ¶¶22-25; p. 9, ¶1). On that same date, Vidal called Plaintiff, who was not scheduled to

work that day, at home and instructed him to meet her in her office the next day (*Id*. at p. 11, ¶¶5-8;

Plaintiff's Deposition, p. 123, ¶¶19-23). On January 21, 2003, Plaintiff and Vidal met and discussed the

events of January 19, 2003 and Vidal's decision to terminate his employment due to his refusal to perform

assigned work (Plaintiff's Deposition, p. 124, ¶¶2-8; p. 130, ¶¶1-5; Vidal Deposition, p. 13, ¶¶2-6).

Plaintiff alleges Vidal also told him during this meeting, "I was not the one that she wanted there because

-3-

she needed someone who could be there to work" (Plaintiff's *Complaint*, ¶5; Plaintiff's Deposition, p. 124, ¶¶19-24; p. 228, ¶¶20-25; p. 229, ¶¶1-4).[1]  Vidal also showed Plaintiff a copy of the Corrective Action Policy and Procedures for University Hospitals of Cleveland, and highlighted where it stated immediate dismissal could result when an employee refused the directive of a supervisor (Plaintiff's Deposition, p. 132, ¶¶8-20).  Notably, Plaintiff testified he understood the Corrective Action Policy and Procedures for University Hospitals of Cleveland states that if an employee refuses to perform assigned work, he can be subject to immediate termination (*Id*. at p. 90, ¶¶18-25; p. 91, ¶¶1-3, 13-16).[2]

According to Plaintiff, his polycystic kidney and liver disease, hyperthyroidism, and sinus tachycardia cause an elevated heart rate, high blood pressure, weakness, difficulty concentrating, hand tremors, shortness of breath, slight chest pain and dizziness (*Id*. at p. 100, ¶¶13-18; p. 193, ¶¶19-20; p. 166, ¶¶3-4; p. 199, ¶¶21-24; p. 219, ¶¶9-25; Plaintiff's *Complaint* ¶¶3, 4; Defendant's *Motion for Summary Judgment*, Exhibit N, p. 6).  According to Plaintiff, Vidal was aware of his polycystic kidney and liver disease in June 2002 but as he was not diagnosed with hyperthyroidism until after he left work on January 19, 2003, he did not tell her of his condition until the January 21, 2003 meeting (Plaintiff's Deposition, p.177; ¶¶10-25; p. 178, ¶¶1-12; p. 215, ¶¶18-25; p. 216, ¶¶16-21; p. 224, ¶¶8-12).  Plaintiff

---

[1]Plaintiff also testified that during this meeting with Vidal, he told her of his hyperthyroidism and sinus tachycardia diagnoses, but he failed to make it clear whether he mentioned the diagnosis prior or subsequent to being told he was being terminated (Plaintiff's Deposition, p. 215, ¶¶18-25; p. 216, ¶¶16-21; p. 224, ¶¶8-12).

[2]Plaintiff's appeals of his termination through Defendant's Complaint Resolution Procedure and Peer Review Committee were unsuccessful (Plaintiff's *Complaint*, ¶5).  He subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission and was issued a "Right to Sue" letter on August 12, 2003 (*Id*. at ¶2).

testified he was able to work while suffering the majority of these symptoms up until January 19, 2003 (*Id*. at p. 167, ¶¶15-21; p. 168, ¶¶15-23; p. 224, ¶¶16-24; p. 225, ¶¶7-15). He also testified the medications he began to take for his alleged disability on January 19, 2003 brought his heart rate into normal range and allowed him to work and attend six-hour computer training courses daily (*Id*. at p. 168, ¶¶11-14; p. 169, ¶¶11-14; p. 171, ¶¶1-7; p. 198, ¶¶20-22; p. 214, ¶¶18-19; p. 215, ¶¶4-9). Plaintiff later qualified that statement, however, by indicating his heart rate occasionally spiked for approximately one to two hours following physical exertion (*Id*. at p. 199, ¶¶1-12). Plaintiff testified he has continued to run his business, White Stone Entertainment Group, established in 1990, for which he writes songs, performs various administrative tasks and buys and sells musical equipment (*Id*. at p. 309, ¶¶10-24). According to Plaintiff, the work is only part time and his business has never made a profit (*Id*. at p. 310, ¶¶9-15; p. 312, ¶¶14-16).

Prior to January 19, 2003, Plaintiff never requested an accommodation for the disability he now alleges (*Id*. at p. 217, ¶¶3-9; p. 224, ¶¶13-19). During his tenure with Defendant, however, Plaintiff did take multiple leaves of absence for conditions unrelated to his alleged disability (*Id*. at p. 248, ¶¶1-3). He was also provided a single consultation with an occupational therapist, and a modified work station, as well as permission to take short breaks and walk away from his work station upon request for other unrelated medical problems (*Id*. at p. 257, ¶¶24-25, p. 258, ¶¶1-6; p. 261, ¶¶22-25, p. 262, ¶¶1-7; p. 270, ¶¶10-21). Nonetheless, he alleges he was treated unfavorably compared to another of Defendant's employees, Regina McCargo. Specifically, he alleges:

> The disparate treatment comes from the fact that Regina had gone to the
> emergency room from a shift [in 2002] and she was off for 14 weeks after
> that. She didn't come back until her 14 weeks were up. And when I

went to the emergency room on January 19, 2003, I came back to work
but I was immediately terminated.

(*Id*. at p. 245, ¶¶3-10).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  Non-moving parties cannot simply rest upon the allegations of their pleadings or general

allegations in establishing that issues of fact may exist.  *Bryant v. Commonwealth of Kentucky*, 490 F.2d

1273, 1275 (6th Cir. 1974).  The Supreme Court has held that, "Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e)

requires the opposing party "go beyond the pleadings and by [his] own affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'" *Id.* at 324.

The Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989), has

interpreted *Celotex* and two related cases, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574 (1986), as establishing a "new

era" of favorable regard for summary judgment motions.  *Street* points out the movant has the initial burden

of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's

case. 886 F.2d at 1479. This burden may be met by pointing out to the court the non-movant, having had

sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. *Id.*

In ruling on a motion for summary judgment, the Court must construe the evidence, as well as any

inferences to be drawn from it, in the light most favorable to the party opposing the motion. *See Kraus v.*

*Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990). The Court must also determine

"whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is

so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby,*

*Inc.*, 447 U.S. 242, 249 (1986). In reaching such a determination, however, the Court is not to decide

disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248-49.

## III. ANALYSIS

### A. Plaintiff's Prima Facie Case of Disability Discrimination Under the ADA

The ADA prohibits an employer from discriminating "against a qualified individual with a disability

because of the disability of such individual in regard to job application procedures, the hiring, advancement,

or discharge of employees, employee compensation, job training, or other terms, conditions, and privileges

of employment." 42 U.S.C. §12112(a). A plaintiff may prove he was discriminated against based upon

his disability either through direct evidence the employer relied on his disability in making an adverse

employment decision or indirect evidence under the ADA. *See Hedrick v. Western Reserve Care*

*System*, 355 F.3d 444, 453 (6th Cir. 2004). In establishing a prima facie case with direct evidence, a

plaintiff bears the burden of proving: (1) he is disabled; and (2) he is otherwise qualified for the position,

(a) without reasonable accommodation from the employer, (b) with an essential job requirement eliminated,

or (c) with reasonable accommodation from the employer. *See Walsh v. UPS*, 201 F.3d 718, 724 (6th

-7-

Cir. 2000).    When a plaintiff seeks to prove his case indirectly, he may establish a prima facie case of discrimination by showing: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) he was replaced.  *See Hedrick*, 355 F.3d at 453; *see also Plant v. Morton International, Inc.*, 212 F.3d 929, 936 (6th Cir. 2000); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).  The prima facie standard for disability discrimination for failure to accommodate is somewhat similar to that for disability discrimination based on wrongful termination.  It requires that a plaintiff establish: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) the employer knew or had reason to know of his disability; (4) an accommodation was needed (*i.e.*, a causal relationship exists between the disability and the requested accommodation); and (5) the employer failed to provide the necessary accommodation. *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997).

The direct and indirect evidence paths are mutually exclusive.  In the present case, however, it is not entirely clear whether Plaintiff's seeks to establish his claim through direct or indirect evidence.  As the Court is unsure as to the manner in which Plaintiff, who is *pro se*, seeks to prove his case, it will assume for the sake of issuing its recommendation that he intends to utilize both methods for establishing wrongful termination and indirect evidence for his failure to accommodate claim.

Defendant contends summary judgment is warranted because Plaintiff cannot prove he was disabled at the time he was terminated, that Defendant knew of his alleged disability at the time of his termination, and that his refusal to "float" was a request for an accommodation.  The Court will address each argument below, as well as additional issues regarding whether the statement made by Plaintiff's

supervisor constitutes direct evidence of discrimination and whether that same statement evidences the fact

Defendant regarded Plaintiff as disabled at the time Vidal decided to terminate him.

### 1. Direct Evidence

When an employer admits, or the evidence establishes, that its decision was based upon a plaintiff's

disability, direct evidence of discrimination exists. *See Monette*, 90 F.3d at 1180. In his complaint,

Plaintiff alleges, "[Vidal] stated I was not the one that she wanted there because she needed someone who

could be there to work. This statement classifies me into a disabled stereotype role that implies the inability

to work when I am able to work," which suggests he is attempting to prove discrimination with direct

evidence (Plaintiff's *Complaint*, ¶5). However, the Court, in reviewing the case law in this Circuit, finds

this purported statement does not constitute direct evidence of discrimination and, therefore, Plaintiff must

prove his case indirectly to survive summary judgment.

This case is analogous to the situation set forth in *Hedrick*, where a plaintiff alleged a supervisor's

statement which questioned her ability to work, constituted direct evidence of discrimination. Specifically,

the plaintiff, who suffered from osteoarthritis in both knees, informed her employer she was unable to

perform her work as a general duty staff nurse. Upon receiving confirmation from her doctor, her employer

placed her on the "ADA list," which was used to find suitable employment within the company for those

employees who could no longer perform the duties of their regular positions. The plaintiff was interviewed

for numerous positions, but was not selected for a position; consequently, she filed suit against her employer

for disability discrimination. During the litigation, the plaintiff's doctor testified that one of the individuals

who interviewed the plaintiff "expressed concern to me that she felt that [the plaintiff's] medical condition

would prohibit her from being able to perform [the job for which she interviewed.]" *Hedrick*, 355 F3d at

453.  The Court rejected the plaintiff's argument that statement was direct evidence of discrimination, concluding instead that the alleged statement was isolated and, absent evidence of a series of comments or reports indicating the employer's animus, insufficient to be direct evidence of discrimination.  *Id.* at 454. The Court also found the employer's comment to the plaintiff's doctor was "an expression of concern for [the plaintiff's] ability to perform the job's requirements" and not "clearly discriminatory."  *Id.* at 455.

In the present case, Plaintiff alleges he was told by a supervisor, "I was not the one that she wanted there because she needed someone who could be there to work."  Like the remarkably similar statement at issue in *Hedrick*, however, this statement was offered to the Court as evidence of discrimination without any additional evidence of a series of comments or reports indicating the employer's animus.  Indeed, as in *Hedrick*, it appears this statement was an isolated event and therefore, cannot be considered direct evidence of discrimination.  Moreover, the language used by Vidal was not "clearly discriminatory," and instead appeared simply to be an expression of concern for Plaintiff's ability and willingness to perform the job's requirements.  Considering the findings in *Hedrick*, the Court finds the statement Plaintiff attributed to Vidal did not constitute direct evidence.  As such, Plaintiff must establish a prima facie case of disability discrimination using the indirect evidence approach.

### 2.  Substantially Limited in a Major Life Activity

Plaintiff bears the burden of proving he had a disability at the time of the alleged discriminatory act. *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 884 n. 13 (6th Cir. 1996); *see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999) (a plaintiff must be "presently – not potentially or hypothetically – substantially limited in order to demonstrate a disability.") The Act defines "disability" as:

-10-

    (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

    (B) record of such an impairment; or

    (C) being regarded as having such an impairment.

42 U.S.C. §12102(2).  The regulations have defined physical impairment as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss," and substantially limited as the inability to perform a major life activity, or a severe restriction on the ability to perform said activity as compared to the average person in the general population.  29 C.F.R. §§1630.2(h), (j).  A nonexclusive list of major life activities offered in the regulations includes functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. §1630.2(i).  In determining whether an impairment substantially limits a major life activity, the Court must consider, "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 20 C.F.R. §1630.2(j)(2).

    In the present case, Plaintiff alleges to suffer from polycystic kidney and liver disease, sinus tachycardia, and hyperthyroidism, which resulted in the "fast heart rate" and high blood pressure  that prevented him from "floating" to Lerner Tower 8 on January 19, 2003 (Plaintiff's *Complaint* ¶¶3, 4; Plaintiff's Deposition, p. 100, ¶¶13-18; p. 193, ¶¶19-20).  According to Plaintiff, these impairments also rendered him weak, made it difficult for him to concentrate, gave him hand tremors which prevented him from typing, and caused dizziness (Plaintiff's Deposition, p. 166, ¶¶3-4; p. 199, ¶¶21-24; Defendant's *Motion for Summary Judgment*, Exhibit N, p. 6).  Plaintiff, however, has failed to designate a specific

major life activity which he believes his condition substantially limits.  Because his main allegation in this claim was his inability to perform an aspect of his job, "floating," the Court can only assume his allegations of disability concern his inability to perform the major life activity of work (Plaintiff's Deposition, p. 174, ¶¶11-12; p. 193, ¶¶13-16).  Defendant argues Plaintiff cannot satisfy this element of the prima facie case because he cannot establish his condition prevented him from performing a broad range of jobs and that, therefore, he was substantially limited in the major life activity of work.  Defendant further contends Plaintiff was not disabled because his condition was sufficiently controlled by medication and was, therefore, not substantially limiting.

When a plaintiff alleges substantial limitation in the major life activity of work, he bears the burden of establishing he was unable to work a broad range or class of jobs.  Specifically, the regulations define substantially limited in the major life activity of work as, "[S]ignificantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. §1630.2(j)(3)(i); *see also Moorer v. Baptist Memorial Health Care System*, 398 F.3d 469, 479 (6th Cir. 2005).  Moreover, "[w]hen a physical or mental impairment does not prevent an individual from performing any specific (or even minute) functions of one's job, then that individual cannot be found to be precluded from performing a broad class of jobs.  To find as such would eviscerate the meaning of 'substantially limits.'" *Matsuka v. Hinckley Twp.*, 56 F. Supp. 2d 906, 915 (N.D. Ohio 1999).

In the present case, Plaintiff has failed to provide any medical documentation in support of his allegation he is substantially limited in his ability to work and has conceded, in fact, that he is able to work.

Indeed, he testified he was able to work despite feeling weak "all the time" (Plaintiff's Deposition, p. 171, ¶¶1-7; p. 214, ¶¶18-19; p. 215, ¶¶4-9).  He also indicated that from the date he was diagnosed with polycystic kidney and liver disease, June 2002, to the date of his termination in January 2003, he was able to work forty hours per week (*Id*. at p. 167, ¶¶15-21; p. 168, ¶¶15-23).  He further testified he took part in a six-hour per day computer training program following his termination, though he struggled to participate occasionally (*Id*. at p. 168, ¶¶10-14).  Additionally, in response to Defendant's interrogatories, Plaintiff indicated he was self-employed, performing work such as song writing, producing pre-recorded cassette tapes with lead sheets, and selling and/or performing the songs (Defendant's *Motion for Summary Judgment*, Exhibit N, p. 10).

From Plaintiff's *Complaint* and the remainder of the record, it is apparent Plaintiff's allegations of being substantially limited in his ability to work stems solely from his inability to perform a specific aspect of his job, "floating," on January 19, 2003.  This allegation alone, however, is insufficient to satisfy his burden, as the ADA requires an employee establish not only that he was unable to perform a specific aspect of his job or the work required of a particular job, but also that he was unable to perform the work of a broad class or range of jobs.  Plaintiff has not done this and, as such, The Court finds grant of summary judgment is warranted.

Defendant's argument as to the mitigating effects of Plaintiff's medication is also supported by the record.  Plaintiff testified the medication he began taking in December 2002 assisted him in performing his daily activities and would help him work a full day (Plaintiff's Deposition, p. 171, ¶¶1-10).  He also noted a second medication he began taking on January 19, 2003, Metoprolpol,  "helped" with his hand tremors, allowed him to type, and brought his heart rate within the normal range (*Id*. at p. 198, ¶¶10-25; p. 215,

¶¶2-9).[3]  Although he explained his heart rate occasionally spiked above normal for about an hour or two after physical exertion, he also testified that prior to January 19, 2003, he worked even when his heart rate was elevated, even though he probably should not have, which suggests any limitations brought about by his elevated heart rate were not substantial. (*Id*. at p. 199, ¶¶1-9; p. 224, ¶¶16-24).  Indeed, the above testimony suggests Plaintiff's medication did away with any substantial limitation caused by his impairments, if any such limitations ever existed, thus rendering said limitations temporary, or at the very least episodic.

In general, short term, temporary restrictions are not substantially limiting. *Roush*, 96 F.3d at 843. Likewise, intermittent, episodic impairments typically are not considered to be disabilities.  *See Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 826 (S.D. Ohio  2004), *citing Johnson v. City of Mason*, 101 F. Supp. 2d 566, 574 (S.D. Ohio 2000).  Episodic, impairing manifestations or flare-ups caused by an underlying chronic condition will only constitute a disability if they occur with sufficient frequency and are of sufficient duration and severity to substantially limit a major life activity.  *See id.* Indeed, the mere possibility of recurrence is not sufficient to establish substantial impairment. *Plant*, 212 F.3d at 938.  The effectiveness of Plaintiff's medications suggests any substantial limitations brought about by his physical condition were temporary and, therefore, he was not disabled.  As indicated above, Plaintiff stated he could work, his medication assisted him in completing his daily activities, including work, and the only limitation to his ability to work was his inability to "float" on January 19, 2003, which arose before he began taking Metoprolpol.  Although Plaintiff testified to occasionally having an elevated heart rate

---

[3]In determining whether a limitation is permanent and substantially limiting, the Court may look to the state of a plaintiff's condition following the discriminatory act to determine if it continued to affect his ability to work.  *Swanson v. University of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001); *Roush v. Weastec, Inc.*, 96 F.3d 840, 844 (6th Cir. 1996).

-14-

following physical exertion, *e.g.,* exercising, mowing the lawn, the manner in which he described his condition (which is all the Court has, as very few medical records have been provided to the Court), renders whatever limitations brought on by this symptom, episodic rather than continuous (Plaintiff's Deposition, p. 199, ¶¶4-9).

Taking all the above into consideration, the Court finds Plaintiff cannot establish he was substantially limited in a major life activity, and therefore, he cannot prove he was disabled as set forth in the ADA.

### 3.  Regarded As Being Disabled

The language in Plaintiff's *Complaint*, "[Vidal] stated I was not the one that she wanted there because she needed someone who could be there to work. This statement classifies me into a disabled stereotype role that implies the inability to work when I am able to work," suggests Plaintiff is not only alleging he was disabled, but that Defendant regarded him as such (Plaintiff's *Complaint*, ¶5). Employees are given three potential avenues in proving disability within the meaning of the ADA, one of which involves proving he was regarded by his employer as having a disability. *See* 42 U.S.C. §12102(2). This prong allows for protection even if an employee is not, in fact, disabled. "The breadth of the Act's protection is the embodiment of its drafters' will to stamp out the stereotyping of and discrimination against persons with disabilities in all their forms, even when that stereotyping or discrimination is misplaced." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

When an employee proceeds under the "regarded as" theory, the Court is required to examine the state of mind of the employer – indeed, this prong of the prima facie case is a question of intent. *See id.* As such, proving an employer regarded an employee as disabled is "'extraordinarily difficult' because 'it is safe to assume employers do not regularly consider the panoply of other jobs their employees could

-15-

perform, and certainly do not often create direct evidence of such considerations.'" *Moorer*, 398 F.3d at 481, *quoting Ross*, 237 F.3d at 709.  The employee must prove the employer entertained misconceptions about him, whether it believed he had a substantially limiting impairment that he actually did not have, or that he had a substantially limiting impairment when, in fact, the impairment was not so limiting.  *See Ross*, 237 F.3d at 706.  "Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Id*.

It is not enough, however, that an employer regarded an employee as somehow disabled – a plaintiff must show the employer regarded him as disabled within the meaning of the ADA. *See id.* at 709.  As such, to be regarded as "substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Moorer*, 398 F.3d at 481; *see also Blair v. Professional Corporations Management Co., Inc.*, 172 F.3d 47, 1999 WL 17648, *2 (6th Cir. Jan. 4, 1999) (Table).  Indeed, just as a plaintiff who alleges he is substantially limited in the major life activity of work must prove he is unable to perform a broad range or class of jobs, a plaintiff alleging his employer regarded him as being substantially limited in his ability to work must prove his employer regarded him as unable to perform a broad range or class of jobs, *i.e.*, other employment suitable for his age, education and experience available in the geographical area, as well, which "is no easy task." *Id.* at 481, 483.

The above-quoted language from the *Complaint* seems to allow Plaintiff to make an argument for the "regarded as" theory of disability, but the Court finds it is insufficient to avoid summary judgment.  Plaintiff has failed to proffer evidence, or even allege Defendant perceived him as being unable to perform a broad range or class of jobs.  Plaintiff testified he told Vidal he was able to perform all aspects of his job

other than "floating," but other than this refusal to perform a single aspect of his job, he gave his employer

no reason to believe was unable to work.  An employer's belief an employee is incapable of performing

a narrow task, or even a particular job, is insufficient to establish an employee was regarded as disabled.

It must be established, as stated above, the employer regarded him as unable to perform a broad range or

class of jobs.  Vidal's statement during the January 21, 2003 termination meeting is insufficient to meet this

burden.

### 4.  Reasonable Accommodation

Under the ADA, an employer is required to provide a reasonable accommodation to a qualified

employee with a disability unless the employer can demonstrate the accommodation would impose an

undue hardship on the operation of its business.  *See* 42 U.S.C. §12112(b)(5)(A).  An employer, however,

need only provide reasonable accommodations that make it possible for the disabled employee to perform

essential functions of his job.  *See Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997), *citing Carter*

*v. Bennett*, 840 F.2d 63, 67 (D.C. Cir. 1988).  The ADA, in pertinent part, defines reasonable

accommodation as, "job restructuring, part-time or modified work schedules, reassignment to a vacant

position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of

examinations, training materials or policies, the provision of qualified readers or interpreters, and other

similar accommodations for individuals with disabilities."  42 U.S.C. §12111(9).  In determining whether

an accommodation is reasonable, the employer must consider: (1) the particular job involved, its purpose

and its essential functions; (2) the employees's limitations and how those limitations can be overcome; (3)

the effectiveness the accommodation would have in enabling the individual to perform the job; and (4) the

preference of the employee.  *Johnson*, 101 F. Supp. 2d at 575.

-17-

Although a plaintiff bears the initial burden of proving the accommodation he seeks is reasonable, this burden is not onerous. *Walsh*, 201 F.3d at 725. He need only "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed the benefits," and establish a causal relationship exists between the disability and the requested accommodation. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 781 (6th Cir. 1998); *Gaines*, 107 F.3d at 1175. Plaintiff alleges his only request for an accommodation during the relevant time period was his January 19, 2003 request not to "float" to Tower 8 (Plaintiff's Deposition, p. 217, ¶¶22-25; p. 224, ¶¶13-16). Defendant, however, contends Plaintiff's request not to "float" was not an accommodation because it would not have aided him in performing his job as he would have been performing the same work regardless of what floor he was assigned. The Court, however, disagrees. As described by Defendant, "floating" is not simply performing the work of a Division Secretary, it is also changing work locations upon request, sometimes multiple times during a shift, thus rendering the job more active than the sedentary-type work a Division Secretary who was not "floating" would be expected to perform (*Id*. at p. 152, ¶¶1-7; p. 153, ¶¶18-25; p. 154, ¶1). Additionally, "floating" to Tower 8 would have resulted in a heavier workload than had Plaintiff just been required to stay at Tower 9 (*Id*. at p. 152, ¶¶1-7). As a request for a lighter workload clearly constitutes "[m]odifications or adjustments ... to the manner or circumstances under which the position held or desired is customarily performed," the Court finds it also constituted an accommodation. 29 C.F.R. §1630.2(o)(ii); *see also Smith v. Henderson*, 376 F.3d 529, 534-35 (6th Cir. 2004). As such, the Court finds Plaintiff's request that he not be required to "float" was not simply a request not to perform a task he already said he could perform as argued by Defendant.

Neither party has offered the Court a single allegation or argument as to the reasonableness of the

-18-

accommodation at issue. However, the Court is inclined to conclude the cost of granting such an accommodation would not be overly burdensome as Plaintiff's supervisor allowed him to go to the emergency room on January 19, 2003 when there were no other Division Secretaries on shift on Tower 9 that day and, thus, no one to float to Tower 8 (Plaintiff's Deposition, p. 100, ¶¶21-23). This evidences that either Vidal was able to find an employee to cover Plaintiff's absence or that Towers 8 and 9 were able to continue thriving without the presence of a Division Secretary; it appears from Plaintiff's deposition testimony that it was the former (*Id*. at p. 114, ¶¶21-25; p. 115, ¶¶1-7; p. 206, ¶¶20-25; p. 207, ¶¶1-2). Regardless, Plaintiff's absence and failure to "float" on January 19, 2003 was not so disruptive as to render his request burdensome. Moreover, Plaintiff testified that "floating" duties are rotated among the other Division Secretaries – the Court finds it hard to imagine that taking a single employee from that rotation would be especially onerous to one of the highest acclaimed hospitals in Northeast Ohio (*Id*. at p. 85, ¶¶21-25; p. 86, ¶¶1-4).

Although the Court finds the cost of Plaintiff's requested accommodation was not overly burdensome, based on its earlier finding that Plaintiff was not disabled, the Court must conclude Plaintiff's requested accommodation was not reasonable. Indeed, there must be a causal relationship between a requested accommodation and a plaintiff's disability. Here, Plaintiff has failed to prove he is disabled as defined in the ADA and, therefore, he cannot establish the necessary causal relationship and prove his accommodation was reasonable. Despite its finding, the Court notes that when faced with similar facts, an employer committed to meeting its ADA responsibilities might well decide to open a dialogue with the employee requesting the accommodation to obtain further, accurate information regarding his condition so that the employer could craft an appropriate, reasonable accommodation, if necessary. *See* 29 C.F.R.

-19-

§1630.2(o)(3).  On the record before the Court, it is difficult to identify any meaningful effort by Plaintiff's supervisor to determine the merits of Plaintiff's claims, at any point.  Nevertheless, for the reasons stated this omission is of no consequence given Plaintiff cannot establish that he was disabled  within the meaning of the ADA.

### 5.  Defendant's Knowledge of Plaintiff's Alleged Disability

As part of a prima facie case, a person alleging disability discrimination under the ADA must establish his employer had actual or constructive notice of his disability.  *See Monette*, 90 F.3d at 1185. Indeed, the ADA does not require an employer who has not been informed of a disability, and has no reason to know of the disability, to accommodate or retain an employee on the chance he might have a disability that limits his ability to perform the work he was hired to do.  Significantly, "[k]nowing that an employee has health problems ... is not the same as knowing that the employee suffers from a disability." *Brown*, 305 F. Supp. 2d at 830.  "The ADA distinguishes between knowledge of a disability versus knowledge of any limitations which the employee experiences as a result of that disability.  The distinction is significant because the ADA only requires employers to accommodate the known physical and mental limitations of the employee." *Matsuka*, 56 F. Supp. 2d at 917 (internal citations omitted).  An employer "is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). Moreover, even if the employer has knowledge of health problems, it cannot be expected to anticipate all problems that the condition may create on the job and spontaneously accommodate them.

Accordingly, if Plaintiff failed to inform Defendant of the limitations he experienced as a result of his polycystic kidney and liver disease, sinus tachycardia, and hyperthyroidism, then he cannot establish it

knew or had reason to know of his disability. *Hammon*, 165 F.3d at 450. Plaintiff testified that on January 19, 2003, he told Defendant he would not "float" to Tower 8 due to an elevated heart rate (Plaintiff's Deposition, p. 217, ¶¶22-25). Merely stating the symptoms of one's impairment, however, is insufficient to convey actual or constructive notice of a disability. *See Hammon,* 165 F.3d at 450 (held an employer was not given sufficient notice of the plaintiff's disability when he told his supervisors of his lost confidence, because he failed to suggest this emotional problem stemmed from a condition of disability); *Keith v. Ashland*, 205 F.3d 1340, 2000 WL 178389, *3-4 (6th Cir. Feb. 8, 2000) (Table) (a plaintiff who told a supervisor, approaching him about his difficulties at work that he was upset about his divorce did not show his employer knew of his disability). Moreover, although he alleges Defendant was aware of his polycystic kidney and liver disease back in June 2002, mere knowledge of an impairment is also insufficient to constitute knowledge of the limitations that resulted from those impairments. *Matsuka*, 56 F. Supp. 2d at 918. The Court, therefore, finds Defendants did not know or have reason to know of Plaintiff's disability.

Based on the foregoing, the Court finds Plaintiff failed to prove all the elements of a prima facie case under the ADA – specifically, that he was disabled as defined under the ADA and that Defendant knew or should have known he was disabled – and as a result, summary judgment is warranted. Even had Plaintiff established all the requisite elements of a prima facie case, however, the Court finds he still could not rebut Defendant's legitimate nondiscriminatory reason for terminating him.

**B.  Burden Shifting Analysis Under the ADA**

Assuming, *arguendo*, Plaintiff successfully established a *prima facie* case of discrimination, the burden of production would shift to Defendant to articulate a legitimate, non-discriminatory reason for the

adverse employment action. *Matsuka*, 56 F. Supp. 2d at 912, *citing Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Should Defendant carry this burden, Plaintiff must then demonstrate its proffered reason for discharge was pretext for unlawful discrimination. However, "[a] reason cannot be proven to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Matsuka*, 56 F. Supp. 2d at 912, *quoting Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804-05 (6th Cir. 1994) (internal quotations omitted).

Defendant contends it terminated Plaintiff for insubordination, *i.e.*, refusing to "float" to Tower 8, in violation of the Corrective Action Policy and Procedures for University Hospitals of Cleveland. The Court finds Plaintiff's failure to comply with the directives of a supervisor constituted a legitimate nondiscriminatory reason for his termination. As such, Plaintiff must rebut Defendant's proffered legitimate, nondiscriminatory reason by proving by a preponderance of the evidence that said reason was pretext. Plaintiff does not satisfy this burden. Even if Plaintiff could point to some relevant evidence from which a jury could draw an inference of discrimination, which he attempts to do by making reference to Vidal's quote the day he was terminated, he cannot show the reason proffered by Defendant was false. Indeed, Plaintiff, undeniably, refused to follow the directive of his supervisor and "float" to Tower 8 when needed, and such conduct was punishable by termination under the Corrective Action Policy and Procedures for University Hospitals of Cleveland. *Matsuka*, 56 F. Supp. 2d at 918, *citing Maddox v. University of Tennessee*, 62 F.3d 843, 848 (6th Cir. 1995) ("an employer may fire a person for his conduct even where that conduct is related to the employee's disability"). Plaintiff bears the burden of proving his discharge was actually based on his alleged disability, and he has not done this – the record indicates it was his refusal to follow Vidal's orders that precipitated his discharge.

Plaintiff attempts to prove discrimination by comparing his treatment and eventual discharge to Defendant's treatment of a co-worker, Regina McCargo.  Specifically he alleges that:

> The disparate treatment comes from the fact that Regina had gone to the emergency room from a shift [in 2002] and she was off for 14 weeks after that.  She didn't come back until her 14 weeks were up.  And when I went to the emergency room on January 19, 2003, I came back to work but I was immediately terminated.

(Plaintiff's Deposition, p. 245, ¶¶3-10).  However, the situations surrounding both events are clearly distinguishable and far too dissimilar to allow for any meaningful comparison.  Indeed, Plaintiff stated he never sought the accommodation of going to the emergency room or a leave of absence, the accommodations he alleges Defendant granted Regina McCargo – thus, the accommodations sought were significantly different.  Moreover, the record indicates Regina McCargo did not engage in the conduct, refusal to perform a work task, that led to Plaintiff's termination.  Additionally, and most significantly, Plaintiff has not even alleged Ms. McCargo was not disabled, which is typically necessary when attempting to prove unfavorable treatment due to a disability by comparing one's treatment to the treatment of a co-worker.  As such, the Court finds Plaintiff's attempt to establish evidence of discrimination by comparing his termination to Defendant's treatment of Regina McCargo, is insufficient to establish pretext.

## IV.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that Defendant's *Motion for Summary Judgment* be GRANTED.

s/ Kenneth S. McHargh

Kenneth S. McHargh

United States Magistrate Judge

Date:  August 18, 2005

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).